UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| SAMUEL HENG, | ) | Case No. CV 10-2742-OP |
|       Petitioner, | ) | |
|       v. | ) | MEMORANDUM OPINION AND ORDER |
| F. GONZALES, Warden, | ) | |
|       Respondent. | ) | |

## I.
## PROCEEDINGS

On April 15, 2010, Samuel Heng ("Petitioner") filed a Petition for Writ of Habeas Corpus by a Person in State Custody pursuant to 28 U.S.C. § 2254 ("Petition").[1] (ECF No. 1.) On August 25, 2010, Respondent filed a Motion to Dismiss the Petition for failure to state a discernable claim and failure to exhaust state judicial remedies. (ECF No. 8.) On February 4, 2011, this Court denied the Motion to Dismiss and ordered Respondent to file an Answer to the Petition. (ECF No. 16.) On April 15, 2011, Respondent filed an Answer to the Petition.

---

[1] The parties both consented to proceed before the United States Magistrate Judge. (ECF Nos. 3, 10.)

1

(ECF No. 21.) Petitioner did not file a Reply to the Answer. Thus, this matter is ready for decision.

## II.
## **PROCEDURAL HISTORY**

On December 4, 2008, Petitioner was convicted after a jury trial in the Los Angeles County Superior Court of lewd conduct upon a child under the age of fourteen (Cal. Penal Code § 288.5(a) (Counts 2-3)), lewd act upon a child (Cal. Penal Code § 288(c)(1) (Count 4)), and sexual penetration by a foreign object (Cal. Penal Code § 289(h) (Count 6)). (Clerk's Transcript ("CT") at 113-18.) On the same date, Petitioner was sentenced to a total state prison term of eight years. (Id. at 134-35.)

Petitioner appealed the judgment to the California Court of Appeal. (Lodgment 2.) On December 28, 2009, the court of appeal affirmed the judgment. (Lodgment 3.)

Petitioner filed a petition for review in the California Supreme Court. (Lodgment 4.) On March 10, 2010, the supreme court denied the petition. (Lodgment 5.)

## III.
## **SUMMARY OF THE EVIDENCE PRESENTED AT TRIAL**

Since Petitioner is not challenging the sufficiency of the evidence, the Court adopts the factual discussion of the California Court of Appeal opinion, as a fair and accurate summary of the evidence presented at trial:[2]

---

[2] "Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary . . . ." Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (citing 28 U.S.C. § 2254(e)(1)). Recent Ninth Circuit cases have accorded the factual summary set forth in an opinion of the California Court of Appeal a presumption of correctness
(continued...)

D.D. was 21 years old at the time of trial. When D.D. was eight or nine years old, she lived with her family in Signal Hill. D.D.'s father brought defendant from Cambodia. Defendant was D.D.'s cousin. Defendant lived in a converted garage of D.D.'s home. D.D.'s aunt, V.C., visited almost daily at their Signal Hill home. Defendant taught karate to D.D. and her brothers.

After defendant lived in D.D.'s home for a while, he asked her if she wanted a massage. Initially, D.D., who was 9 or 10 years old, did not think there was anything wrong with being massaged. Thereafter, defendant began to feel D.D.'s breasts under her clothing and "played" with her vagina. These massages took place after D.D. returned home from school in the converted garage. Defendant massaged D.D. on more than 10 occasions with no one else present. . . . D.D. told her parents what occurred. D.D.'s father got mad at defendant. But D.D.'s mother defended defendant. Thereafter, defendant continued to massage D.D. and play with her clitoris two to three times a week.

. . . .

After a year or two, D.D. began to feel that it was inappropriate for defendant to massage her. D.D.'s family and defendant moved to Long Beach during her freshman year in high school. D.D.'s father did not move with them. D.D.'s mother and defendant had moved as a couple. D.D.'s mother was pregnant. Thereafter, defendant began to masturbate in front of D.D. . . . Defendant told D.D. that he would kill her if she told anyone. D.D. believed defendant because he had a gun

---

(...continued)
pursuant to 28 U.S.C. § 2254(e)(1). See, e.g., Moses v. Payne, 555 F.3d 742, 746 n.1 (9th Cir. 2009) (citations omitted); Slovik v. Yates, 556 F.3d 747, 749 n.1 (9th Cir. 2009).

in his room.

D.D. had her own room at the Long Beach house. After the computer was moved into her room, D.D. moved into the master bedroom. Defendant had been coming to D.D.'s room every two or three weeks when she was asleep. Defendant stood over D.D. When D.D. awoke, defendant would tell her to go back to sleep. D.D. could lock the door to the master bedroom. Defendant would masturbate when D.D. was at the computer. Defendant would take his penis out of his shorts and "play with himself" in D.D.'s words. This occurred on more than one occasion.

One afternoon after D.D. moved to the master bedroom, defendant unlocked her door, locked himself inside the room with her and threatened her with a knife. D.D. was at the computer. Defendant unbuttoned D.D.'s pants. When D.D. began screaming, defendant took out the knife and held it against her neck. Defendant told D.D. to be quiet or he would kill her. D.D. was afraid because she believed he would use the knife against her. Defendant attempted to get inside D.D.'s pants with his hands. D.D. pushed defendant. D.D. and defendant fell to the floor. Defendant had D.D. get on her knees. D.D. complied because she was afraid. Defendant rubbed his erect penis against D.D.'s buttocks over her clothing. Defendant reached into D.D.'s jeans and placed his fingers in D.D.'s vagina and moved them. Eventually, defendant released D.D. Defendant told D.D. not to say anything. D.D. told her boyfriend about what happened. On the same day, D.D. told V.C. what had happened. D.D. told both of them not to say anything because she was afraid. D.D.'s mother was happy and in love with defendant. D.D. did not want to hurt her mother's feelings.

. . . .

. . . While in high school, D.D. told her uncle . . . defendant said he loved her, went through her letters and would not leave her alone. D.D. moved in with the uncle when she was approximately 17 years old. D.D.'s uncle called the police. D.D. spoke with the police in 2004. D.D. told the officer everything that had happened except for defendant's threats. Thereafter, D.D. spoke with a representative from the Children and Family Services Department on more than one occasion. D.D. denied telling any social worker anything about the molestation. D.D. testified, "I told them to leave me alone." The social worker, an unidentified man, asked D.D. about the allegations she had made to the police. D.D. denied she was molested to the social worker. D.D explained why she lied to the social worker: "Because my mom told me to lie. And I wanted her to be happy." But D.D. told her mother what had happened.

In 2006, D.D.'s mother became ill and ultimately died. D.D. visited her mother at the hospital in Westminster daily. D.D. visited the hospital daily. D.D. described a conversation with defendant at the hospital: "Well, in my mom's room, she was halfway gone already. And he said that he just loves me and my mom." D.D. still struggled with trying to put her experiences with defendant behind her at the time of trial.

(Lodgment 3 at 2-5.)

## IV.
## **PETITIONER'S CLAIM**

Petitioner claims that his rights to a speedy trial and due process were violated by pre-arrest delay. (Pet. at 4; Opp'n to Mot. to Dismiss at 1.)

/ / /

5

# V.
# STANDARD OF REVIEW

The standard of review applicable to Petitioner's claims is set forth in 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"):

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). If these standards are difficult to meet, it is because they were meant to be. Harrington v. Richter, 131 S. Ct. 770, 786, 178 L. Ed. 2d 624 (2011). AEDPA "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings[,]" and a writ may issue only "where there is no possibility fairminded jurists could disagree that the state court's decision conflicts" with U.S. Supreme Court precedent. Id. Further, a state court factual determination shall be presumed correct unless rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

Under the AEDPA, the "clearly established Federal law" that controls federal habeas review of state court decisions consists of holdings (as opposed to dicta) of Supreme Court decisions "as of the time of the relevant state-court

decision." Williams v. Taylor, 529 U.S. 362, 412, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000). To determine what, if any, "clearly established" United States Supreme Court law exists, the court may examine decisions other than those of the United States Supreme Court. LaJoie v. Thompson, 217 F.3d 663, 669 n.6 (9th Cir. 2000). Ninth Circuit cases "may be persuasive." Duhaime v. Ducharme, 200 F.3d 597, 600 (9th Cir. 1999). On the other hand, a state court's decision cannot be contrary to, or an unreasonable application of, clearly established federal law, if no Supreme Court precedent creates clearly established federal law relating to the legal issue the habeas petitioner raised in state court. Brewer v. Hall, 378 F.3d 952, 955 (9th Cir. 2004); see also Carey v. Musladin, 549 U.S. 70, 77, 127 S. Ct. 649, 166 L. Ed. 2d 482 (2006) (in the absence of a Supreme Court holding regarding the prejudicial effect of spectators' courtroom conduct, the state court's decision could not have been contrary to or an unreasonable application of clearly established federal law).

Although a particular state court decision may be both "contrary to" and an "unreasonable application of" controlling Supreme Court law, the two phrases have distinct meanings. Williams, 529 U.S. at 405. A state court decision is "contrary to" clearly established federal law if the decision either applies a rule that contradicts the governing Supreme Court law, or reaches a result that differs from the result the Supreme Court reached on "materially indistinguishable" facts. Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002) (per curiam) (citing Williams, 529 U.S. at 405-06). When a state court decision adjudicating a claim is "contrary to" controlling Supreme Court precedent, the reviewing federal habeas court is "unconstrained by § 2254(d)(1)." Williams, 529 U.S. at 406. However, the state court need not cite or even be aware of the controlling Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them." Packer, 537 U.S. at 8.

State court decisions that are not "contrary to" Supreme Court law may only

be set aside on federal habeas review "if they are not merely erroneous, but 'an unreasonable application' of clearly established federal law, or based on 'an unreasonable determination of the facts.'" Id. at 11 (citing 28 U.S.C. § 2254(d)). Consequently, a state court decision that correctly identified the governing legal rule may be rejected if it unreasonably applied the rule to the facts of a particular case. See Williams, 529 U.S. at 406-10, 413 (e.g., the rejected decision may state Strickland rule correctly but apply it unreasonably); Woodford v. Visciotti, 537 U.S. 19, 24-25, 123 S. Ct. 357, 154 L. Ed. 2d 279 (2002) (per curiam). However, to obtain federal habeas relief for such an "unreasonable application," a petitioner must show that the state court's application of Supreme Court law was "objectively unreasonable." Visciotti, 537 U.S. at 27. An "unreasonable application" is different from an erroneous or incorrect one. Williams, 529 U.S. at 409-10; see also Visciotti, 537 U.S. at 25.

Where, as here, the California Supreme Court denies a petitioner's claims without comment, the state high court's "silent" denial is considered to be "on the merits" and to rest on the last reasoned decision on these claims, in this case, the grounds articulated by the California Court of Appeal in its decision. See Ylst v. Nunnemaker, 501 U.S. 797, 803-06, 111 S. Ct. 2590, 115 L. Ed. 2d 706 (1991); Hunter v. Aispuro, 982 F.2d 344, 347-48 (9th Cir. 1992); see also Kennedy v. Lockyer, 379 F.3d 1041, 1052 (9th Cir. 2004); Gill v. Ayers, 342 F.3d 911, 917 n.5 (9th Cir. 2003).

## VI.
## DISCUSSION

A. **Background.**

Petitioner contends his rights to a speedy trial and due process were violated by pre-arrest delay. (Pet. at 4; Opp'n to Mot. to Dismiss at 1.) Specifically, he bases this on the fact that although a warrant was issued on October 29, 2004, he was not arrested until April 27, 2008. (Opp'n to Mot. to Dismiss at 1-2.) He

8

claims that the detective in charge of the investigation did not exhaust all means to find him during that almost four-year period and, therefore, because the detective "did little to find the petitioner, it seems this case was not that important to really arrest the perpetrator." (Id. at 2.) He claims he was prejudiced by the delay because the only witness who would have testified on his behalf, the victim's mother, died prior to the trial. (Id. at 3.)

The court of appeal provided the following additional background:

Defendant filed a dismissal motion for delay in prosecution alleging that the complaint in this case was filed on October 29, 2004. Defendant was not arrested until April 27, 2008. Defendant argued that he was prejudiced as a result of the delay because D.D.'s mother had died and was no longer able to testify on his behalf. Defendant repeated these allegations at the hearing on the dismissal motion. Los Angeles Police Detective Jennifer Kearns testified that she was the investigating officer in this case. D.D. first reported the offenses on August 20, 2004. A complaint was filed on October 29, 2004. An arrest warrant was issued the same day. Detective Kearns spoke to: D.D.; D.D.'s uncle; V.C.; and D.D.'s aunt. Detective Kearns learned that defendant had fled to Cambodia when he learned of these charges. D.D.'s mother would neither return Detective Kearns's telephone calls nor answer the door. Detective Kearns learned that defendant sold his Honda automobile to get money to survive in Cambodia.

Detective Kearns went to defendant's address on 65th Street. However, no one answered the door. Detective Kearns entered the arrest warrant into the national data base, believing if defendant returned to the United States he would be detained on that warrant. Detective Kearns also advised D.D. and her family members to notify the police if they had information regarding his whereabouts. Detective Kearns

believed the family would cooperate because they were all fearful of defendant. Defendant had made threats to family members. Detective Kearns believed defendant was in Cambodia. In 2008, Detective Kearns learned that defendant had been arrested in Buena Park. Detective Kearns was unaware that defendant received a traffic citation in 2006 or changed his address in April 2007. Detective Kearns believed that the federal immigration authorities would have been alerted to defendant's warrant when he reentered the United States.

Defense counsel argued that D.D.'s mother had been adamant that the sexual misconduct allegations were untrue. Defendant conceded that he left the country for Cambodia but then returned. Defense counsel argued that if the police had been more diligent in running driver's license checks and the like, an arrest would have occurred sooner and minimized the delay in prosecution. Defense counsel reiterated that D.D.'s mother could have been interviewed regarding the motive for the allegations. The prosecutor argued that D.D.'s mother was never a percipient witness to the alleged sexual acts. In addition, others that lived in the home during the time in question, could testify that they never saw any of the acts themselves.

In denying the motion, the trial court ruled: "It seems to me that Detective Kearns did what she was supposed to do. She got information from multiple family members that [defendant] was in Cambodia. You concede that he in fact was in Cambodia. . . . What else is she to do at that point? She put the warrant into the system. That system includes the federal aspect to it. And she relied on law enforcement, federal or otherwise, immigration or otherwise, to make an arrest should [defendant] return to the country. That's not an unreasonable position to take in my view. [¶] Beyond that, I am going to guess that she is a

busy person. We see our police forces stretched very thin on too many occasions. Does the law really require her to pick up the file every couple of months and go out and do all this all over again and again having put into the system and having relied on the feds to do their job? [¶] I think she did what was expected. [¶] Secondly, I don't see any prejudice in this case. I don't know how the victim's mother would testify that nothing happened. Sexual assaults, . . . child molestation, after all, takes place in private, in darkness and away from the prying eyes of people who could put a stop to it. So to say that the woman saw nothing hardly diminishes or hardly makes her a valuable witness. [¶] As to her speculation as to the child's motive, other than being mere speculation, I don't see that it is anything more than that. So respectfully your request to dismiss for pre-arrest delay is denied."

(Lodgment 3 at 5-7.)

B. **California Court Opinions.**

The California Court of Appeal rejected this claim:

> Defendant acknowledges that federal speedy trial rights do not attach upon the filing of the felony complaint. However, defendant argues that his federal and state speedy trial rights were violated because of Detective Kearns's failure to repeatedly check on his whereabouts, thereby resulting in "severe" prejudice. Defendant admittedly fled the country at approximately the same time the felony complaint was issued. The trial court could reasonably find he did so to avoid prosecution. Detective Kearns performed all of the duties required to insure defendant was apprehended at the first available opportunity. A valid arrest warrant was lodged in the national system to detect defendant's return through immigration or police agencies. In fact, defendant was eventually arrested as a result of that warrant when he received a traffic

citation. Moreover, we are unpersuaded by defendant's claim that he was prejudiced because D.D.'s mother could not testify on his behalf. As noted D.D.'s mother had died. As the prosecutor argued in the trial court, D.D.'s mother was not a percipient witness to the sexual acts. Others living in the family home at the time of defendant's sexual acts with D.D., including her younger brothers, could also testify that they were unaware of any such activity. Defendant has not demonstrated that purposeful delay can be attributed to the government. As a result, the trial court could reasonably deny his speedy trial motion.

(Id. at 8 (citations omitted).)

C. **Analysis.**

1. **Speedy Trial Right.**

A speedy trial is a fundamental right guaranteed the accused by the Sixth Amendment to the Constitution and imposed by the Due Process Clause of the Fourteenth Amendment on the states. Klopfer v. North Carolina, 386 U.S. 213, 223, 87 S. Ct. 988, 18 L. Ed. 2d 1 (1967). The Sixth Amendment right to a speedy trial however, does not attach until a defendant has been "indicted, arrested, or otherwise officially accused" in the course of a criminal prosecution. United States v. MacDonald, 456 U.S. 1, 6, 102 S. Ct. 1497, 71 L. Ed. 2d 696 (1982); see also United States v. Marion, 404 U.S. 307, 313, 92 S. Ct. 455, 30 L. Ed. 2d 468 (1971).

In denying Petitioner's speedy trial claim, the California Court of Appeal specifically relied on these federal authorities in finding that Petitioner's right to a speedy trial under the Sixth Amendment had not been violated. (Lodgment 3 at 7.) The court of appeal noted that the prosecution filed the felony complaint on October 29, 2004, that Petitioner immediately fled the country, and that Petitioner was not arrested, indicted, or officially accused in a court of law at that time. (Id. at 8; see also Reporter's Transcript ("RT") at 6-8; CT at 62.) The court of appeal's

factual findings are binding on this Court. <u>Miller-El</u>, 537 U.S. at 340. Moreover, there is no claim, or evidence in the record, that there was any significant delay *after* Petitioner's arrest or indictment.

Based on the foregoing, the Court finds that the California court's rejection of Petitioner's claim was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court. Thus, habeas relief is not warranted on this claim.

### 2. **Due Process Violation.**

Petitioner also contends his due process rights were violated by the delay. The Court disagrees.

As explained in <u>Marion</u>, "the Due Process Clause of the Fifth Amendment would require dismissal of the indictment if it were shown at trial that the pre-indictment delay in this case caused substantial prejudice to [the petitioner's] rights to a fair trial and that the delay was an intentional device to gain tactical advantage over the accused." <u>Marion</u>, 404 U.S. at 324. The Ninth Circuit has set forth a two-part test for determining whether delay in charging a defendant constitutes a due process violation: (1) the defendant must prove actual, non-speculative prejudice from the delay; and (2) the length of the delay, when balanced against the reason for the delay, must offend those fundamental conceptions of justice which lie at the base of our civil and political institutions. <u>United States v. Huntley</u>, 976 F.2d 1287, 1290 (9th Cir.1992); <u>United States v. Ross</u>, 123 F.3d 1181, 1186 (9th Cir. 1997) (a petitioner "must show some form of actual prejudice before [the court] need balance the factors to determine whether his due process rights were violated by the delay."). "After making the balancing determination, a pre-indictment delay will be permissible unless it violates fundamental conceptions of justice which lie at the base of our civil and political institutions." <u>Id.</u> at 1185 (quoting <u>United States v. Moran</u>, 759 F.2d 777, 782 (1985)).

Based on the authorities cited, Petitioner must demonstrate he was actually prejudiced by the delay as an initial matter. Id. at 1185. This is a "heavy burden." Moran, 759 F.2d at 782; see also United States v. Martinez, 77 F.3d 332, 335 (9th Cir. 1996) (noting that "[t]he task of establishing the requisite prejudice for a possible due process violation is 'so heavy' that we have found only two cases since 1975 in which any circuit has upheld a due process claim.") (quoting United States v. Huntley, 976 F.2d 1287, 1290 (9th Cir. 1992)) (internal quotation marks omitted). As the Ninth Circuit has explained, "[s]uch prejudice will inevitably be either the loss of witnesses and/or physical evidence or the impairment of their use, e.g., dimming of the witnesses' memory." United States v. Mays, 549 F.2d 670, 677 (9th Cir. 1977). The proof of such prejudice "must be definite and not speculative, and the defendant must demonstrate how the loss of a witness and/or evidence is prejudicial to his case." Moran, 759 F.2d at 782; see also Huntley, 976 F.2d at 1290 ("To establish actual prejudice, therefore, defendant must show that the loss of testimony meaningfully has impaired his ability to defend himself."). If a petitioner fails to make a showing that he suffered actual prejudice, the court need not consider the reasons for the delay. United States v. Manning, 56 F.3d 1188, 1194 (9th Cir. 1995). Petitioner has not met this heavy burden.

In this case, Petitioner contends that he was prejudiced by the death of the victim's mother, who died during the delay period. On appeal, he claimed that the victim's mother "would have testified that the accusation was false and instigated by the abusive ex-husband." (Lodgment 2 at 26.) According to the social worker's report, the victim was not willing to testify and denied anything was wrong; the other children denied anything was going on; and the mother "flat-out contradicted the accusation." (Id. at 26 (citing CT at 66-68).) As a result, as noted by the court of appeal and as supported by the record, other members of the household, including the victim's brothers and sisters, were alive at the time of trial and could also have testified they had seen nothing. (CT at 68.) The fact that

the victim's mother did not witness any assaults did not make her a valuable witness, as the assaults took place in private, and there was no evidence that any of the assaults were witnessed by anyone. Moreover, the victim's aunt, who was the same age as the victim, also testified at trial that Petitioner had touched her (the aunt) inappropriately, lending support to the victim's testimony. (RT at 137-42.) There was also testimony tending to show that despite Petitioner's contention that the victim's father encouraged the victim to claim Petitioner had sexually abused her so that he could obtain custody, the victim never went to live with her father after the allegations surfaced – she went to live with her uncle. (Id. at 85-86.) Accordingly, Petitioner has failed to show any actual, non-speculative prejudice from the delay between the crimes and the arrest. For that reason, the Court need not balance the delay with the reasons behind it.

However, even if the Court did engage in that analysis, there is nothing to show that there was any purposeful delay that could be attributed to the government. There is nothing in the record to show that anyone, including the police, knew that the victim's mother would die and waited for that event to happen before arresting Petitioner. There is ample evidence that the investigating officer made attempts to find Petitioner, and after discovering that he had fled to Cambodia, a fact admitted by Petitioner, put an arrest warrant into a national data base. (RT at 6-9.) The detective also asked the family to notify her if they obtained information regarding Petitioner's whereabouts. (Id. at 10.) Finally, in 2008, the detective learned that Petitioner had been arrested in Buena Park and immediately responded to that information. (Id. at 10-11.) In short, the pre-arrest delay was neither prejudicial nor unreasonable.

Based on the foregoing, the Court finds that the California court's rejection of Petitioner's claim was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court. Thus, habeas relief is not warranted on this claim.

# VII.
# CONCLUSION

Based on the foregoing, the Court finds that habeas relief is not warranted on Petitioner's claims. Thus, the Court denies the Petition and dismisses this action with prejudice, and Judgment shall be entered accordingly.

**IT IS SO ORDERED.**

DATED: July 22, 2011

HONORABLE OSWALD PARADA
United States Magistrate Judge